Filed 4/23/21  California Fire-Roasted v. Olam West Coast CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA FIRE-ROASTED LLC, | C086686 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-00170784-CU-BC-GDS) |
| v. | |
| OLAM WEST COAST, INC., | ORDER PARTIALLY GRANTING REQUESTS FOR JUDICIAL NOTICE, MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:

The request for judicial notice filed by plaintiff on April 8, 2021, is denied as to exhibit 1 and granted as to exhibit 2.  The request for judicial notice filed by defendant on April 15, 2021, is granted.

It is ordered that the opinion filed on March 24, 2021, be modified as follows:

1

1.　　On page nine, delete footnote nine.

2.　　On page 17, the opening parenthetical at the end of the last line of the page, "(*Id.* at p. 420," shall be deleted and replaced with the following:

(*Id.* at p. 1420,

3　　On page 22, delete the second and third sentences in the first full paragraph beginning with the words "The trial court's focus . . ." and replace with the following, while retaining the footnote at the end of the third sentence:

First, there exist well-established procedures to remedy discovery abuses, which CFR utilized in this action.  Second, the prejudice that CFR purportedly suffered would have occurred even if Olam never had made the admissions.[RETAIN ORIGINAL FN.]

This modification does not change the judgment.

The petition for rehearing is denied.

BY THE COURT:

＿＿＿＿＿RAYE＿＿＿＿＿＿, P. J.

＿＿＿＿＿RENNER＿＿＿＿, J.

＿＿＿＿＿KRAUSE＿＿＿＿, J.

2

Filed 3/24/21  California Fire-Roasted v. Olam West Coast CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA FIRE-ROASTED LLC, | C086686 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2014-00170784-CU-BC-GDS) |
| v. | |
| OLAM WEST COAST, INC., | |
| Defendant and Appellant. | |

Plaintiff California Fire-Roasted LLC (CFR) and defendant Olam West Coast, Inc. (Olam), are parties to an agreement under which Olam agreed to pay fees in exchange for the right to use CFR's "Licensed Technology," as defined, for the production of fire-roasted and smoked tomato products.  The fees required to be paid under the agreement were based on the total volume of tomato products produced using the Licensed Technology.

In 2014, CFR filed a complaint alleging that Olam breached their agreement by using CFR's Licensed Technology to manufacture tomato products without paying

1

license fees.  The complaint also alleged claims for quantum meruit and for breach of the implied covenant of good faith and fair dealing.

In 2017, CFR moved for summary adjudication against Olam on its breach of contract claim.  CFR narrowly argued that undisputed facts established that Olam breached the agreement by using one specific aspect of the Licensed Technology—the "know-how" embodied in certain roasting equipment—to produce tomato products without paying license fees.  CFR made clear in its motion that it was not pressing its patent rights or trade secret claims and asserted that the trial court therefore "need not address . . . whether Olam's use of either of the roasters in question utilizes the 'trade secrets' that are included among the Licensed Technology[, or whether] the know-how is confidential, publicly available, or subject to efforts to maintain secrecy . . . ."

Olam opposed CFR's motion on several grounds, including that Olam was only obligated under the agreement to pay license fees when using CFR's *proprietary* know-how, and CFR failed to establish that the know-how allegedly used by Olam was proprietary to CFR or a trade secret.  Olam also claimed to have discovered that it made errors when preparing its discovery responses, causing it to vastly overstate the volume of tomato products it produced.  Thus, in connection with its opposition to CFR's motion for summary adjudication, Olam filed a motion to withdraw its responses to certain requests for admissions.

The trial court denied Olam's motion to withdraw its admissions, granted CFR's motion for summary adjudication, dismissed CFR's other claims against Olam, and entered judgment in favor of CFR.  The court also granted a motion imposing issue sanctions against Olam for misuse of the discovery process and a motion to strike Olam's supplemental designation of experts.

On appeal, Olam challenges (1) the judgment entered following the grant of CFR's motion for summary adjudication, (2) the order denying its motion to withdraw admissions, (3) the order striking its supplemental designation of experts, and (4) the

2

order imposing issue sanctions.[1]  We will affirm the order imposing issue sanctions, but otherwise reverse and remand for further proceedings.

BACKGROUND FACTS AND PROCEDURE

CFR is the holder of a United States patent (No. 6,099,882) entitled "Method and Apparatus for Roasting and Smoking Skinned Food Products" (the "Patent").  The Patent claims both a system (apparatus) and method (process) for preparing skinned food products.[2]  The system described in the Patent consists of a roasting unit, a smoking chamber, and a conveyor system for transporting the skinned food product through the roasting unit and smoking chamber.  The method described in the Patent consists of a process for preparing skinned food by contacting the product with heat to loosen the skin and provide an aesthetically pleasing appearance, and then contacting the product with smoke for a period of time to infuse a smoky flavor.

In 2004, CFR agreed to allow General Mills Operations, LLC, formerly known as General Mills Operations, Inc. ("General Mills"), to use its technology for the production of fire-roasted and smoked vegetables and fruit products.  As part of that contractual arrangement, CFR agreed to fabricate, deliver, install, and sell certain custom fabricated equipment (the "Equipment").  The Equipment, which included a roaster (the "GM Roaster") and smoking chamber, was similar (but not identical) to the apparatus/system described in CFR's Patent.[3]

---

[1]    CFR has filed a protective cross-appeal requesting that, should we reverse the judgment on the order granting summary adjudication, we also reverse the grant of judgment on the pleadings on CFR's implied covenant and quantum meruit claims.

[2]    By "skinned food," we are referring to food having a skin, such as tomatoes, not food that has been stripped of its skin.

[3]    It is undisputed that many of the GM Roaster's design details are contrary to, or not depicted in, CFR's Patent.

3

In conjunction with the sale of the Equipment, General Mills entered into a "License Agreement" with CFR. The recitals to that agreement state that CFR "possesses certain expertise, confidential information and other proprietary rights relating to tomato processing," and that General Mills desires to obtain a license to use CFR's Licensed Technology (as defined in the Agreement) to operate the Equipment.

Under the License Agreement, CFR granted to General Mills the nonexclusive right to use CFR's Licensed Technology to produce tomato products. In exchange, General Mills agreed to pay license fees calculated based on the volume of tomato products produced "using all or any part" of that Licensed Technology.[4] The License Agreement provides that CFR's consent is limited to the construction of one unit of Equipment to operate the licensed process. It further provides that, except as set forth in the agreement, General Mills shall have no right to construct additional units of Equipment or to use the Licensed Technology.

Paragraph 3.2 of the agreement provides that CFR shall retain all right, title, and interest in and to (i) the Licensed Technology, (ii) any derivative work of all or any part of the Licensed Technology, and (iii) any process, product, concept, invention, design, or development that is "derived, modified, adapted or translated in any way from all or any part of the Licensed Technology."

Pursuant to the License Agreement, the Equipment was installed at a cannery in Williams, California, operated by SK Foods, L.P. ("SK Foods"), a General Mills copacker. CFR consented to SK Foods's use of the Equipment to pack product for General Mills, subject to the terms, conditions, and restrictions of the License Agreement.

---

**4** The fees are based on a price per "unit," which is defined as 4.5 gallons of volume of product. The agreement provides different unit prices for different types of tomato product. In this case, the parties stipulated to the relevant unit prices for each year from 2004 through 2016.

In or about 2007, a dispute arose between CFR and SK Foods relating to the use of the Equipment and the Licensed Technology. Specifically, CFR learned that SK Foods had modified the Equipment so that it could use the GM Roaster without the associated smoking chamber, and that SK Foods was using the GM Roaster to make product for customers other than General Mills without paying license fees to CFR. CFR argued that SK Foods was required to pay the full license fee even if only the roasting portion of the Equipment was being used. In contrast, SK Foods took the position that it could use the roasting portion of the Equipment without paying fees to CFR because the License Agreement only applied to the two-phase roasting-and-smoking process described in the Patent.

In December 2007, CFR, General Mills, and SK Foods settled their dispute by entering into an amended and restated consent agreement. The parties agreed that SK Foods could use the roasting portion of the Equipment, without the smoking chamber, to process tomato products for customers other than General Mills in exchange for a reduced license fee.

In 2009, SK Foods filed for bankruptcy. As part of the bankruptcy proceeding, Olam purchased substantially all of SK Foods's operating assets, including the canning facility that housed the Equipment. Olam intended to use the purchased assets to, among other things, produce tomato products for General Mills. Consistent with this intent, Olam hired many of the employees who worked at the canning facility when it was owned by SK Foods.

Shortly after purchasing SK Foods's assets, Olam requested CFR's consent to use the GM Roaster, without the smoke chamber, to produce fire-roasted tomato products. Olam indicated that it expected "to pay a fee to CFR for this as was done in the past."

In July 2009, CFR, General Mills, and Olam entered into a consent agreement (the "Consent Agreement") that allowed Olam to use the Equipment and the Licensed Technology to process tomato products for General Mills in compliance with the terms,

5

conditions, and restrictions of the License Agreement, including the license fee provisions.

Sometime after entering into the Consent Agreement, Olam began using the GM Roaster to manufacture fire-roasted tomato products, not only for General Mills, but for other customers as well. There is no evidence that Olam informed CFR that it was using the GM Roaster to produce tomato products for other customers, and Olam never paid CFR license fees for using the GM Roaster to produce those products.

Without informing CFR, Olam also constructed a second roasting unit ("Roaster No. 2") at the canning facility. Olam hired Timothy Pekarek, who had previously worked for SK Foods, to design the new roaster. Richard Freitas, senior director of tomato operations for Olam, instructed Pekarek to duplicate the GM Roaster, except to make it longer to accommodate more burners. Pekarek, who had never seen any roaster other than the GM Roaster, drafted a plan for the new roaster using measurements taken from the GM Roaster.

Roaster No. 2 was built next to the GM Roaster. The design of Roaster No. 2 appears to be substantially identical to the GM Roaster. Other than being a little longer to accommodate additional burners, Pekarek was unaware of any differences between the two roasters. Richard W. Klopp, Ph.D., a professional engineer, examined both roasters and opined that "[v]irtually every aspect and feature of Roaster No. 2 that handles and interacts with . . . tomato products . . . is virtually identical to the GM Roaster," including all of the design choices in the GM Roaster that differ from CFR's Patent.

Once Roaster No. 2 was operational, Olam began using it, along with the GM Roaster, to manufacture tomato products for customers other than General Mills without reporting the production or paying license fees to CFR.

*CFR's complaint and discovery*

In 2014, CFR filed a complaint alleging that Olam breached the License Agreement and the Consent Agreement by using aspects of CFR's Licensed Technology

6

to (1) build Roaster No. 2 and (2) produce tomato products without paying the required license fees. CFR also alleged claims against Olam for quantum meruit and for breach of the implied covenant of good faith and fair dealing.[5]

In written discovery, CFR requested that Olam (1) identify the total number of gallons and units of tomato products it produced using the roasters during the period from 2009 to 2016, and (2) produce all documents related to such production. In response, Olam produced two spreadsheets entitled "SVI Production Data Reports" (the "SVI Reports"). It produced two spreadsheets, instead of one, because Olam had upgraded its production accounting software in 2013. One spreadsheet listed production volumes for Olam's tomato products from 2010 to 2013. The other listed production volumes from 2013 to 2016.

Excluding production for General Mills, the 2010 to 2013 spreadsheet showed production of 2,129,646 gallons and 10,786,728 cases, and the 2013 to 2016 spreadsheet showed production of 90,920,257 gallons and 6,733,170 cases. Altogether, Olam reported 93,049,903 gallons and 17,519,898 cases of tomato product between 2010 and 2016.[6] Olam's discovery responses were verified by senior vice president Michael Smyth.

Based on Olam's interrogatory responses, CFR served requests for admissions asking Olam to admit that the SVI Reports accurately stated the number of cases and gallons of fire-roasted tomato products that Olam manufactured between 2010 and 2016. Olam admitted that the numbers in the SVI Reports were accurate. The admissions were signed by Olam's counsel and verified by Smyth.

---

[5]    CFR's complaint also alleged claims against General Mills. General Mills subsequently settled and CFR dismissed all causes of action against it.

[6]    Because Olam was unable to locate production data for 2009, the parties stipulated that Olam's production for 2009 would be set at 95 percent of its 2010 production.

*CFR's motion for summary adjudication*

In 2017, CFR moved for summary adjudication against Olam on a portion of its breach of contract claim. Specifically, CFR argued that undisputed facts established that Olam breached the agreement by using one aspect of the Licensed Technology—the "know-how" embodied in the GM Roaster and Roaster No. 2—to produce tomato products for customers other than General Mills without paying license fees.

CFR asserted there was no triable issue of fact regarding CFR's damages because (1) the parties stipulated to the applicable license fee rates, and (2) Olam admitted through its discovery responses the exact amount of tomato products manufactured each year. Thus, the damage to CFR caused by Olam's failure to pay license fees could easily be determined by multiplying the volume of tomato products produced and the applicable license fee rate (plus prejudgment interest).

Based on Olam's production figures for 2010 through 2016, and the stipulation regarding production in 2009, CFR's damages expert calculated Olam's total production (excluding General Mills) from 2009 to 2016 as approximately 8.2 million units (or about 37 million gallons).[7] CFR calculated its total damages for the period from 2009 through 2016 as $19,208,169.

For its part, Olam disputed that it breached the Consent Agreement by impermissibly using CFR's "know-how." It noted that CFR's motion relied on a flawed premise: that it doesn't matter whether the "know-how" at issue was proprietary or a trade secret. Olam argued that this issue was, in fact, of "critical importance" because the License Agreement did not, and legally could not, require Olam to pay license fees to use nonproprietary know-how. Olam argued there was no evidence establishing that any of the know-how embodied in the roasters was proprietary to CFR, especially after CFR

_____

**7** Olam contends that CFR's damages expert calculated its production as 8,297,298 units (or 37,337,841 gallons).

8

disclosed that know-how to dozens of SK Foods employees without a confidentiality agreement in place.

*Olam's motion to withdraw admissions*

Shortly after CFR filed its motion for summary adjudication, Olam apparently discovered an error in the SVI Reports upon which CFR relied to calculate its damages. Thus, in August 2017, Olam filed a motion to withdraw its admissions (requests for admission Nos. 115-124) that the production data stated in the SVI Reports were accurate. Olam claimed that it erroneously admitted that it produced 93,049,903 gallons and 17,519,898 cases of tomato product for customers other than General Mills from 2010 to 2016. Olam asserted the correct figures are 19,867,875 gallons and 10,084,160 cases.[8]

*The trial court's rulings*

The trial court denied Olam's motion to withdraw the admissions.[9] It ruled that Olam's evidence was insufficient to show the alleged errors were the result of excusable neglect or mistake. The court also ruled that CFR would be substantially prejudiced by withdrawal of the admissions.

The trial court also granted CFR's motion for summary adjudication. It ruled that Olam was obligated to pay license fees for using any know-how embodied in the roasters, whether or not it was proprietary. Because it was undisputed that Olam used the roasters to process tomato products for customers other than General Mills, and failed to pay license fees under the License Agreement, the court concluded that Olam breached its

---

[8] Olam's memorandum suggested the correct number of gallons produced was 23,248,973, but this was not supported by the declaration that accompanied the motion to withdraw. On appeal, Olam argues that the correct number is 19,867,875 gallons.

[9] Olam filed a petition for writ of mandate and request for stay challenging the trial court's order, which we denied.

contractual obligations.  Further, having denied Olam's motion to withdraw its admissions, the court concluded there was no triable issue of material fact as to the calculation of CFR's damages.  Thus, the court awarded CFR $19,208,169 in damages for the years 2009 to 2016.

On stipulation of the parties, the court subsequently modified the order granting summary adjudication to include an additional $1,406,781.66 in damages (plus interest) for 2017.  The court also concluded that CFR's remaining claims against Olam—for breach of the implied covenant and quantum meruit—were no longer viable, and therefore granted a motion for judgment on the pleadings with respect to those claims. The parties stipulated to judgment based on the order granting summary adjudication, and the court entered a judgment against Olam for  $21,474,991.17 (the sums of $19,208,169 and $1,406,781.66, plus interest), plus costs and attorney fees.

## DISCUSSION

### I

#### *Grant of Summary Adjudication*

Olam contends that the trial court erred in granting summary adjudication on the basis that Olam breached the License Agreement by using CFR's know-how.  Olam argues, as it did below, that the License Agreement protects only proprietary or trade secret know-how and that the agreement did not, and legally could not, require license fees for using nonproprietary know-how.  Thus, Olam contends it was CFR's burden to show Olam used CFR's proprietary know-how, which burden CFR failed to carry.

A.    *Standard of review*

A party is entitled to summary adjudication of a cause of action if there is no triable issue of material fact and the party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subds. (c) & (f)(1).)[10]  A plaintiff moving for summary

---

**10**      Undesignated statutory references are to the Code of Civil Procedure.

10

adjudication meets its initial burden by presenting evidence that would require a reasonable trier of fact to find each element of the cause of action has been established under the applicable standard of proof. (§ 437c, subd. (p)(1); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.) If the plaintiff meets its burden, then the burden shifts to the defendant to show that a triable issue of material fact exists as to the cause of action or a defense thereto. (§ 437c, subd. (p)(1); *Bank of America, N.A. v. Roberts* (2013) 217 Cal.App.4th 1386, 1392.)

We review a grant of summary adjudication de novo, independently examining the record to determine whether a triable issue of material fact exists. (§ 437c, subd. (c).) Because summary judgment is a drastic measure that deprives the losing party of trial on the merits, we liberally construe the evidence in favor of the party opposing the motion and resolve all doubts concerning the evidence in favor of the opposing party. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460; *Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 304.)

B.      *Analysis*

In granting summary adjudication to CFR, the trial court concluded that Olam was contractually obligated to pay license fees for using the know-how embodied in the roasters, regardless of whether that know-how was proprietary. Because it was undisputed that Olam used the roasters to produce products for customers other than General Mills without paying license fees, the court concluded that Olam breached its contract with CFR, and was liable for damages equal to the amount of the unpaid license fees.

On appeal, Olam contends the trial court erred by concluding that it was obligated to pay license fees for using any know-how embodied in the roasters, regardless of whether the know-how was proprietary or trade secret. Olam argues that it was contractually and legally obligated to pay license fees only for using CFR's *proprietary* know-how. We agree that the trial court erred in its interpretation of the contract.

11

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. (Civ. Code, § 1636.) " 'Where the contract language is clear and explicit and does not lead to absurd results, we ascertain intent from the written terms and go no further.' [Citation.]" (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 53; Civ. Code, §§ 1638, 1639.) If the interpretation of the contract does not turn on the credibility of extrinsic evidence, the question is one of law and our review is de novo. (*Munoz v. City of Tracy* (2015) 238 Cal.App.4th 354, 358; accord, *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1134.)

In this case, the parties agreed in the Consent Agreement that Olam's use of CFR's Licensed Technology would be subject to the terms and conditions set forth in the License Agreement. The parties also agreed that the terms not defined in the Consent Agreement "shall have the meanings given [to] them in the License Agreement." Because "Licensed Technology" is not defined in the Consent Agreement, we look to the definition in the License Agreement.

Paragraph 2.1 of the License Agreement defines the term "Licensed Technology" to mean, collectively, "(a) The *family of related proprietary manufacturing processes and inventions covered under [the Patent]*, . . . the purpose of which is related to the production of fire-roasted and smoked vegetables and fruit products (collectively 'Licensed Process') . . . [as] described in greater detail on the attached Exhibit A;[11] and

---

**11** Exhibit A further defines the Licensed Process as follows: "The Licensed Process is a process for fire-roasting tomatoes and tomato products. Such process is more particularly described as follows: [¶] (a) The process begins by delivering whole, clean, sorted tomatoes into the roaster feed hopper. The tomatoes are (i) conveyed through the roaster on vari-speed rollers, and (ii) water-rinsed immediately after the flame burners; [¶] (b) The tomatoes are then delivered to smoker infeed conveyer [*sic*] and held in the smoke chamber to achieve the desired flavor intensity. The smoke generator uses

[¶] (b) All trade secrets, *know-how*, patents, patent rights, patent applications, copyrights, copyright registrations, moral rights, trademarks, service marks, trademark and service mark registrations, goodwill *and other proprietary rights and intellectual property rights* which (i) relate to all or any part of the Licensed Process, and (ii) arise or are subject to protection under the laws of the United States of America or any other jurisdictions (collectively 'Intellectual Property Rights')."  (Italics added.)

As defined, the Licensed Technology clearly includes the "family of related proprietary manufacturing processes and inventions" covered under CFR's Patent.  But CFR opted not to move for summary adjudication based on Olam's failure to pay licensing fees for using its patented invention.  Rather, as the trial court acknowledged, CFR moved for summary adjudication on the "narrow issue" that Olam breached its contractual obligation to pay license fees for using the "know-how" embodied in the GM Roaster and Roaster No. 2.  CFR argued, and the trial court decided, that Olam was obligated to pay for using "any" know-how embodied in the roasters, regardless of whether it was proprietary.  Olam contends this was error.  We agree.  By its unambiguous terms, the License Agreement only protects "proprietary . . . and intellectual property rights which (i) relate to . . . the Licensed Process, and (ii) arise or are subject to protection under the [law] . . . ."

Applying the "last antecedent" rule, the trial court interpreted this phrase to modify only the word "goodwill," which immediately precedes it, and not the other words in the sentence, including "know-how."  However, the last antecedent rule is " ' "not immutable" ' and should not be 'rigidly applied' in all cases."  (*People ex rel.*

---

proprietary blend of wet wood chips on a burner coil to develop the smoke and deliver it to the smoke chamber; [¶] (c) The process also includes the ability to educt smoke into juice and/or puree streams to be used in topping juice, purees, sauces and/or pastes; and [¶] (d) The process ends at the discharge of the smoker conveyor and/or at the educt point in the juice or puree steam."

13

*Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 530.) " '[I]f the clear intent of the parties is opposed to the application of the rule, the rule must yield.' " (*Ibid.*; accord, *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1413 [when sense of the entire act requires that a qualifying word or phrase apply to several preceding words, its application will not be restricted to the last]; *State ex rel. Bartlett v. Miller* (2016) 243 Cal.App.4th 1398, 1409-1410 [same].) Such is the case here.

The term "know-how" is listed among a suite of other proprietary and intellectual property rights, such as trade secrets, patents, patent applications, copyrights, and trademarks. In this context, to construe the phrase "and other proprietary rights and intellectual property rights" as modifying only the word "goodwill" makes little sense. It would mean that the term "Licensed Technology" includes proprietary goodwill that is related to the Licensed Process, *and* all other trade secrets, know-how, patents, patent rights, patent applications, copyrights, copyright registrations, moral rights, trademarks, service marks, trademarks and service mark registrations, regardless of whether they have anything to do with CFR's Licensed Process. This obviously was not the parties' intent.[12] The only reasonable interpretation of the agreement is that the term "Licensed Technology" includes only trade secrets, know-how, and other proprietary and intellectual property rights which both (i) relate to all or any part of the Licensed Process, and (ii) are subject to protection under the law.[13]

---

[12] CFR's attempt to give the agreement a different interpretation based on the course of dealing between CFR and SK Foods is unavailing. As CFR admitted in response to Olam's statement of undisputed facts, its prior relationship with SK Foods is irrelevant and immaterial to CFR's motion for summary adjudication because Olam entered into a separate, integrated agreement with CFR.

[13] It is incorrect to claim, as CFR does, that know-how and patent applications cannot constitute protectable rights. (See *Hobbs v. United States* (5th Cir. 1967) 376 F.2d 488, 493 [right of inventor while application is pending is an inchoate right, which

14

We conclude that Olam was not contractually obligated to pay license fees for using nonproprietary know-how embodied in the roasters. As a consequence, to prevail on its narrowly drawn motion for summary adjudication, CFR was required to prove that its proprietary know-how was embodied in the roasters such that *whenever* Olam used the roasters it necessarily was using CFR's proprietary know-how. CFR may well be able to meet this burden, but we conclude on the record before us that it has not yet done so.

In support of its claim that Olam breached the License Agreement, CFR relied on the testimony of its expert, Dr. Richard W. Klopp, to show that CFR's know-how was embodied in the GM Roaster and Roaster No. 2. But Dr. Klopp made no effort to differentiate between proprietary and nonproprietary know-how, assuming that the distinction was irrelevant. CFR even conceded that Dr. Klopp's declaration "[did] not establish that the 'know-how' . . . embodied in the Roasters is proprietary."[14]

Further, there is no material fact in CFR's separate statement that CFR's proprietary know-how is embodied in the GM Roaster or Roaster No. 2. (§ 437c, subd. (b)(1) [supporting papers must include a separate statement setting forth plainly and concisely all material facts that the moving party contends are undisputed]; *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 [court may ignore evidence not disclosed in moving party's separate statement]; *San Diego*

---

matures when the patent issues]; *Sarkes Tarzian, Inc. v. United States* (S.D.Ind. 1958) 159 F.Supp. 253, 256 [same]; 35 U.S.C. §§ 154(d), 261; 1 International Business Planning: Law and Taxation, § 8.06 (2020) [discussing licensing of proprietary know-how]; 1A Eckstrom's Licensing in Foreign & Domestic Operations, § 8A:38-41 (2021); *Asahi Glass Co. v. Toledo Engineering Co.* (N.D. Ohio 2007) 505 F.Supp.2d 423, 433; see also *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1456 [technical know-how is quintessential trade secret].)

**14** Similarly, the testimony from Olam's product manager—that Olam restricted access to its facility and the roasters—does not establish that the roasters embodied CFR's proprietary know-how as a matter of law. Olam presented evidence that any know-how embodied in the roasters was common to the industry and publicly available.

15

*Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 315 [same]; see also *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335, superseded by statute on another ground as stated in *Certain Underwriters at Lloyd's of London v. Superior Court* (1997) 56 Cal.App.4th 952, 957, fn. 4 [separate statements are required to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions].) Indeed, CFR expressly disclaimed any need for the court to address the issue: "Nevertheless, the instant motion for summary adjudication does not request, and the Court need not address, whether Olam's use of either of the roasters in question utilizes the 'trade secrets' that are included among the Licensed Technology. Thus, whether the know-how is confidential, publicly available, or subject to efforts to maintain secrecy is not relevant to the merits of this particular motion."

Because CFR did not meet its burden to establish that its proprietary know-how was embodied in the roasters, such that whenever Olam used the roasters it necessarily was in breach of the agreement, the burden never shifted to Olam to show there was a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 850.) Accordingly, we reverse the judgment on the order granting summary adjudication and, pursuant to CFR's cross-appeal, on Olam's motion for judgment on the pleadings.

II

*Order Denying Motion to Withdraw Admissions*

Olam next contends that the trial court abused its discretion by denying its motion to withdraw admissions under section 2033.300.

A.    *Standard of review*

A matter admitted in response to a request for admission is conclusively established against the party making the admission unless the court permits withdrawal or amendment of that admission under section 2033.300. (§ 2033.410, subd. (a).) The court may permit a party to amend or withdraw an admission if it determines the admission was the result of mistake, inadvertence, or excusable neglect, and the party who obtained

16

the admission will not be substantially prejudiced in maintaining that party's action on the merits.  (§ 2033.300, subd. (b).)  The court may impose conditions on the granting of the motion that are just, including, but not limited to, an order that the party who obtained the admission be permitted to pursue additional discovery or that the costs of any additional discovery be borne in whole or in part by the party amending or withdrawing the admission.  (§ 2033.300, subd. (c).)

Because the statutory language used in section 2033.300, "mistake, inadvertence, or excusable neglect," is similar to that found in section 473, subdivision (b), the terms have been interpreted to have the same meaning.  (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1418-1419 (*New Albertsons*.)  Thus, as under section 473, subdivision (b), mere mistake, inadvertence, or neglect does not warrant relief.  (*Martin v. Taylor* (1968) 267 Cal.App.2d 112, 113.)  Instead, the mistake, inadvertence, or neglect must be excusable.  (*Ibid*.; *New Albertsons, supra*, at pp. 1420-1421; *Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 258 [construing section 473] (*Zamora*).)  A party's mistake, inadvertence, or neglect is excusable when a reasonably prudent person might have made the same error under the same or similar circumstances.  (*Zamora, supra*, 28 Cal.4th at p. 258.)

A ruling on a motion for relief under section 2033.300 is reviewed for abuse of discretion.  (*New Albertsons, supra*, 168 Cal.App.4th at p. 1421; *Elston v. City of Turlock* (1985) 38 Cal.3d 227, 233, superseded by statute on other grounds as stated in *Tackett v. City of Huntington Beach* (1994) 22 Cal.App.4th 60, 64 [relief under section 473].)  However, because the purpose of section 2033.300 is to eliminate undeserved windfalls, and because the law strongly favors resolution of lawsuits on the merits, the "trial court's discretion in ruling on a motion to withdraw or amend an admission is not unlimited, but must be exercised in conformity with the spirit of the law and in a manner that serves the interests of justice." (*New Albertsons*, at pp. 1418, 1420.)  Any doubts must be resolved in favor of the party moving for relief from the effect of their admissions.  (*Id.* at p. 420,

17

citing *Elston, supra*, 38 Cal.3d at p. 233.)  The court's discretion to deny a motion is therefore limited to circumstances where the record *clearly* shows that (1) the mistake, inadvertence, or neglect was inexcusable, or that (2) granting the motion "would *substantially* prejudice the party who obtained the admission in maintaining that party's action or defense on the merits." (*New Albertsons*, at pp. 1420-1421, italics added.)

B.     *Additional background*

In support of its motion to withdraw the admissions, Olam submitted a declaration from the executive in charge of the division responsible for production of tomato products, Venkatraman Gopalakrishnan.  In his declaration, Gopalakrishnan explained that the spreadsheets (SVI Reports) produced in response to CFR's discovery requests were created by accounting personnel using the software connected to Olam's production machinery, which automatically records production data at the time of manufacturing.

Gopalakrishnan declared that he reviewed the spreadsheets and concluded, erroneously, that they accurately reported the quantity of cases and gallons of product produced by Olam.  Olam subsequently discovered that the operations and accounting personnel made numerous errors when compiling the data for the spreadsheets. Gopalakrishnan described those errors and the reasons they occurred.

As to the 2010 to 2013 spreadsheet, Gopalakrishnan identified two errors that had the effect of overstating the number of gallons and cases produced.  First, as a result of being unfamiliar with the pre-2013 software, Olam's employees failed to use "version codes" to filter out transactions (such as labeling) that did not involve actual production. Second, also due to unfamiliarity with the pre-2013 software, the employees failed to recognize the need to filter out "production reversal" codes, and therefore reported negative numbers (reversals) as positive numbers (new production).

As to the 2013 to 2016 spreadsheet, Gopalakrishnan identified four errors.  First, because Olam's employees were asked to produce information in a format they do not normally use, Olam's employees sometimes erroneously used the weight of a container,

18

rather than the number of gallons in a container, when calculating the amount of product produced. Second, as a result of human error, the employees occasionally forgot to filter out "label only" entries in the data, thereby erroneously including labeling transactions as additional production. Third, due to human error, employees occasionally overstated the number of cans of fire-roasted tomato product in a case. Finally, also due to human error, employees occasionally overstated the number of ounces in a given can of tomato product.

Gopalakrishnan declared that these errors caused the gallons produced (net of production for General Mills) to be overstated by 73,182,028 gallons (93,049,903 instead of 19,867,875) and the cases produced (net of General Mills) to be overstated by 7,435,738 cases (17,519,898 instead of 10,084,160). Gopalakrishnan declared that these errors were excusable because the reports were prepared during an extremely busy work season, the employees were unfamiliar with the pre-2013 software, and the employees were asked to produce information in an unfamiliar format that they do not normally use.

The trial court denied Olam's motion to withdraw the admissions.[15] The court ruled that the declaration from Gopalakrishnan was insufficient to justify relief. The court criticized Gopalakrishnan for failing to explain his efforts to confirm the accuracy of the numbers when he initially reviewed the spreadsheets. The court also noted that Olam's senior vice president Michael Smyth, who verified Olam's discovery responses, did not submit a declaration explaining that his verification was the result of mistake, inadvertence, or excusable neglect. Further, the court ruled that CFR would be substantially prejudiced by withdrawal of the admissions, not only because its motion for summary adjudication relied upon the admissions, but also due to Olam's destruction of

---

[15]   Olam filed a petition for writ of mandate and request for stay challenging the trial court's order, which we denied.

19

contemporaneous production records (tally sheets) that could have been used to test and verify the data in the spreadsheets.

   C.   *Analysis*

Olam contends the trial court abused its discretion in denying Olam's motion because the court held Olam to an unreasonably high standard and failed to resolve any doubts in its favor. We agree.

The trial court effectively required Olam to show that the erroneous admissions were not caused by Olam's negligence or carelessness. But the relevant inquiry under section 2033.300 does not ask whether the party was careless or negligent; it asks whether the party's mistake or neglect was *excusable*, i.e., whether a reasonably prudent person might have made the same mistake under the same or similar circumstances. (*Zamora, supra*, 28 Cal.4th at p. 258.) And because doubts in applying section 2033.300 must be resolved in favor of the party seeking relief, the court's discretion to deny relief is limited to circumstances in which the mistake, inadvertence, or neglect was *clearly inexcusable*. (*New Albertsons, supra*, 168 Cal.App.4th at pp. 1420-1421.) Otherwise, the policy favoring trial on the merits prevails. (*Ibid.*)

Here, Gopalakrishnan adequately explained the errors that were made during the compilation of the data and the reasons they occurred.[16] Due to a combination of factors, including overburdened staff, the change in production software, and the need to produce information in a new and unfamiliar format, the record supports the conclusion that a reasonable person could have made the same mistakes under the same or similar circumstances.

---

[16]    We are unpersuaded by CFR's argument that Gopalakrishnan's declaration was inadmissible or should have been disregarded because he was not personally responsible for the errors. (See *Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 799.)

CFR assumes that even if the employees' errors in compiling the data are excusable, the motion properly was denied because Olam failed to show that it could not have discovered the errors before verifying the accuracy of the data.[17] We disagree. Olam was not required to prove the errors could not have been discovered, only that they were the types of errors that a reasonably prudent person might have made under the same or similar circumstances. (See *Zamora, supra*, 28 Cal.4th at pp. 252-253, 258 [relief granted even though attorney could have reviewed settlement and discovered mistake].) While CFR is incredulous as to how Olam failed to notice such a large discrepancy in its production, this is explained by the fact that Olam was being asked to produce data in an unfamiliar format (gallons) during a busy time and with employees who were not well acquainted with the older software on which some of the data was stored. Resolving all doubts in Olam's favor, as we must, we conclude the mistakes were at least arguably excusable. (*New Albertsons, supra*, 168 Cal.App.4th at p. 1421 [reversing denial of motion to withdraw admission where mistake was "at least arguably excusable"].)

Likewise, it is not clear from this record that CFR would be *substantially* prejudiced if the admissions are permitted to be withdrawn. It is true that withdrawing the admissions may create a triable issue of material fact as to damages, and thereby

---

**17**     CFR argues vigorously that Gopalakrishnan's declaration is incompetent because it was Smyth who verified the admissions. We are not aware of any authority, however, that requires the person who verified the responses be the one to establish excusable mistake or neglect under section 2033.300. In fact, Smyth merely signed the verification in his capacity as an officer or agent of Olam. (§ 2033.240, subd. (b).) The purpose of his verification was to (1) make the discovery responses admissible and (2) provide a witness who could testify concerning the sources for the discovery responses. (*Melendrez v. Superior Court* (2013) 215 Cal.App.4th 1343, 1349.) Nothing precludes another knowledgeable witness from establishing the factual predicates supporting relief under section 2033.300.

deprive CFR of the ability to succeed on a motion for summary adjudication. But this is precisely the type of "undeserved windfall" section 2033.300 is intended to prevent.

The trial court's focus on the prejudice that CFR purportedly faced from discovery abuses unrelated to the withdrawal of the admissions—the destruction of certain production tally sheets—is misplaced. First, as explained in part IV, *infra*, Olam was held to account for its destruction of records. Second, the same prejudice would have occurred if Olam never had made the admissions.[18] And finally, we are not convinced that Olam's destruction of the tally sheets is nearly as significant as CFR suggests, given that the sole, original source of Olam's production data is its automated production software, not the manual tally sheets, which are used only for quality control for retail products. Withdrawing the admissions will not prevent CFR from impeaching or cross-examining Olam's witnesses on the new production data and how and why it differs from the prior production data.

We conclude, as did the Court of Appeal in *New Albertsons, supra*, 168 Cal.App.4th 1403, that the policy favoring trial on the merits compels the conclusion that the trial court erred in denying the motion to withdraw the admissions. Accordingly, we reverse the order and remand with directions to enter a new order granting the motion. On remand, the trial court may impose such conditions on the granting of the motion as are just, pursuant to section 2033.300, subdivision (c). (§ 2033.300, subd. (c); *New Albertsons*, at p. 1421.)

---

[18] If CFR desires to use the tally sheets to test and verify the new production data, it may do so, at least for 2014 and later. If CFR finds meaningful discrepancies, the court (or the trier of fact) may take that into consideration when assessing Olam's failure to preserve the tally sheets for prior years.

## III

### *Order Granting Motion to Strike Supplemental Designation of Experts*

Olam also contends the trial court erred in granting the motion to strike Olam's supplemental expert designation as untimely. In light of our decision to reverse the grant of summary adjudication and the order denying Olam's motion to withdraw admissions, we reverse and remand this issue for the court to reconsider whether Olam unreasonably failed to disclose the damages experts in its initial expert exchange.

### A. *Standard of review*

After the initial trial date is set, any party may demand a mutual and simultaneous exchange of expert witnesses expected to offer testimony at trial. (§ 2034.210.) Within 20 days of the initial exchange, a party may submit a supplemental list of experts. (§ 2034.280, subd. (a).) However, upon motion, the trial court shall exclude the opinion of a supplemental expert if the designating party "unreasonably failed" to list that witness as an expert during the initial exchange. (§ 2034.300, subd. (a); but see § 2034.310.)

We review a trial court's ruling on a motion to exclude an expert's opinion for abuse of discretion. (*Boston v. Penny Lane Centers, Inc.* (2009) 170 Cal.App.4th 936, 950; *Stanchfield v. Hamer Toyota, Inc.* (1995) 37 Cal.App.4th 1495, 1504.)

### B. *Additional background*

On August 28, 2017, the parties simultaneously exchanged their expert witness information as required by section 2034.260. Consistent with its motion for summary adjudication, CFR's disclosure identified Dr. Dennis Mandell as an expert who would offer opinion testimony on the calculation of CFR's damages. In its disclosure, Olam did not identify a damages expert.

Approximately two and a half weeks later, on September 15, 2017, Olam served a supplemental disclosure identifying two damage experts. CFR moved to strike Olam's supplemental expert designation, arguing that Olam should have identified its damage experts during the initial expert exchange.

The trial court granted the motion, ruling as follows: "There is no dispute that this is a damages case and has been since the outset. Nonetheless, Olam did not initially designate a damages expert. The only rationale Olam offers for failing to designate a damages expert during initial disclosures is that it believed the calculation of any damages was a foregone conclusion given its own admissions to discovery propounded by CFR. [Citation.] According to Olam, its supplemental designation is predicated on an order permitting it to withdraw those admissions. Because the Court has denied Olam's motion to withdraw admissions, the predicate for the supplemental designation is absent, and Olam's supplemental designation of damages experts is stricken."

C. *Analysis*

As discussed above, Olam's explanation for failing to designate a damages expert during the initial exchange was that it believed the calculation of damages was a foregone conclusion due to its discovery admissions. Olam subsequently discovered significant errors in its discovery responses and filed a motion to withdraw its admissions. Thus, as the court recognized, Olam's supplemental expert designation was predicated on its motion to withdraw the admissions.

Because we conclude the court erred in denying Olam's motion to withdraw the admissions, we conclude the trial court's order granting CFR's motion to strike should be reversed and the matter remanded to the trial court for it to exercise its remaining discretion under section 2034.300 to decide whether Olam unreasonably failed to comply with the expert exchange requirements under all the circumstances.

IV

*Order Granting Motion for Sanctions*

Olam finally contends the trial court abused its discretion by granting CFR's motion for issue sanctions. We find no abuse of discretion.

24

A.    *Standard of review*

Section 2023.030 vests the trial court with discretion to impose sanctions for misuse of the discovery process.  (§ 2023.030.)  Under proper circumstances, those sanctions may include monetary sanctions, issue sanctions, evidentiary sanctions, terminating sanctions, or contempt sanctions.  (*Ibid.*)

We review a trial court's order imposing discovery sanctions under the abuse of discretion standard, resolving all evidentiary conflicts in favor of the ruling.  (*Pratt v. Union Pacific Railroad Co.* (2008) 168 Cal.App.4th 165, 183.)  We will reverse only if the trial court's order was arbitrary, capricious, or whimsical.  (*Colgate-Palmolive Co. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1768, 1788.)

B.    *Additional background*

As part of CFR's discovery requests, CFR requested that Olam produce "all documents comprising or related to production records for any wet tomato products manufactured using at least in part" the GM Roaster or Roaster No. 2.  As described above, Olam responded to CFR's discovery requests by producing the SVI Reports, which were compiled by Olam employees using an automated computer system connected to the production equipment, which records data at the time of production.

In addition to its production software, Olam uses two forms of paper records related to tomato production.  One is called a "batch sheet" and is used to ensure a given product meets manufacturing specifications and quality guidelines.  The batch sheets show the ingredients incorporated in products and the taste test results of those products. The other is called a production "tally sheet" and is used to track the number of cans and cases of retail products to a particular pallet for quality control and food safety purposes. For simplicity, we shall refer to the batch sheets and tally sheets collectively as the "QC documents."

In its regular course of business, Olam maintains QC documents for the shelf life of the product plus one year, which generally means three years.  After that time, the

25

documents usually are destroyed. In this case, Olam's employees confirmed that they were not asked to alter Olam's record retention policy or impose a "litigation hold" to preserve records potentially related to this lawsuit. Thus, despite having participated in a failed mediation with CFR and General Mills in 2013, Olam discarded its QC documents sheets for 2009 and 2010 before CFR commenced this action in October 2014. And in accordance with company policy, Olam continued destroying QC documents for some time after CFR commenced this lawsuit, destroying all the QC documents for 2011, and some of the documents for 2012, and possibly 2013.

In September 2017, CFR moved for an order imposing issue or evidentiary sanctions against Olam for its spoliation of the QC documents.[19] The trial court granted the motion, imposing an issue sanction that all fire-roasted tomato products produced by Olam from 2009 to 2013 that included any liquid/condensed smoke were contacted with smoke for a period of time sufficient to provide the product with a "smoky" flavor.

C.      *Analysis*

Olam initially argues that the trial court erred in granting the motion because CFR failed to meet and confer before making the motion, as required under section 2031.310, subdivision (b). However, Olam's reliance on section 2031.310 is misplaced. That section applies to motions to compel further discovery responses. (§ 2031.310, subd. (b).) CFR did not file a motion to compel further discovery responses under section 2031.310; it filed a motion for sanctions based on a misuse of the discovery process under section 2023.030. There is no requirement for a party to meet and confer before seeking sanctions under section 2023.030. (*Sinaiko Healthcare Consulting, Inc. v. Pacific Healthcare Consultants* (2007) 148 Cal.App.4th 390, 411.) Thus, the court

---

[19]     Although not at issue here, CFR also sought, and was granted, an order compelling Olam to produce any relevant production records not already destroyed and imposing issue/evidentiary sanctions against Olam for false discovery responses.

correctly concluded that CFR was not required to meet and confer before moving for sanctions under section 2023.030.

Olam next argues that the trial court erred by imposing an issue sanction absent a showing that Olam willfully failed to comply with a prior court order compelling discovery. CFR responds that Olam forfeited this argument by failing to raise it below. We agree. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1; 9 Witkin, Cal. Procedure (5th ed. 2020 supp.) Appeal, § 400, pp. 86-87.) In any event, case authority holds that misconduct committed during discovery may justify the imposition of nonmonetary sanctions without a prior order compelling discovery where, as here, it is reasonably clear that obtaining such an order would have been futile because the documents no longer exist. (*New Albertsons, supra*, 168 Cal.App.4th at pp. 1424-1426; *Do It Urself Moving & Storage, Inc. v. Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 35-36, superseded on other grounds as stated in *Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1595; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1546.)

Olam also claims the sanction was unwarranted because there was no evidence of willfulness. Not so. There was substantial evidence to support the finding that Olam willfully destroyed the QC documents.[20] Such evidence includes (1) that Olam destroyed QC documents after CFR invoked the mediation provisions of the Consent Agreement; (2) that Olam continued destroying such documents even after CFR commenced this lawsuit and began taking discovery; (3) the testimony of Olam's employees that they were not asked to identify or preserve records that might be relevant to this lawsuit; and (4) Olam's other willful discovery abuses, including false interrogatory responses. Under

---

[20] Under the doctrine of implied findings, we presume that the trial court made all factual findings necessary to support its order. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1271-1272.)

the circumstances, the trial court's determination that Olam misused the discovery process by destroying QC documents for the years 2009 through 2013 is supported by the record. We find no abuse of discretion in its decision to impose issue sanctions.

## DISPOSITION

We affirm the order imposing issue sanctions, but otherwise reverse and remand for further proceedings consistent with this opinion. Olam shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (3).)


                                                                KRAUSE              , J.


We concur:


        RAYE             , P. J.


        RENNER          , J.